**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL LEWIS, LAUREN TAYLOR, C.L., a minor, and B.L., a minor, by and through their guardian ad litem,<br><br>                                        Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, COUNTY AGENT IAN BAXTER, COUNTY AGENT N. QUINTEROS, COUNTY AGENT SUPERVISOR BENITA JEMISON,<br><br>                                        Defendants. | Case No.:  3:13-cv-02818-H-JMA<br><br>**ORDER DENYING POST TRIAL MOTIONS, AFFIRMING JUDGMENT AGAINST COUNTY OF SAN DIEGO**<br><br>[Doc. Nos. 215, 218, 219, 225, 229, 230, 240] |

On March 20, 2017, the jury returned a verdict in this § 1983 action for a warrantless removal of children in favor of individual social worker Defendants Quinteros, Baxter, and Jemison, but against the County.  (Doc. Nos. 201, 202.)  The Court entered judgment accordingly on March 23, 2017.  (Doc. No. 204.)

On April 19, 2017, Plaintiffs filed a motion for new trial.  (Doc. No. 215.)  On April 20, 2017, the County filed a motion to strike the judgment against them, as well as a motion for judgment as a matter of law.  (Doc. Nos. 218, 219.)  On April 24, 2017, the Court issued a scheduling order regarding post-trial briefing.  (Doc. No. 220.)  On May 8,

2017, Plaintiffs filed a motion to strike the County's motions. (Doc. No. 225.) On June 26, 2017, the County submitted supplemental briefing in support of its motions. (Doc. Nos. 229, 230.) On July 24, 2017, Plaintiffs filed responses in opposition to the County's motions. (Doc. Nos. 232, 233.) On July 24, 2017, the County filed a response in opposition to Plaintiffs' motion to strike. (Doc. No. 231.) On July 24, 2017, Defendants filed a response in opposition to Plaintiffs' motion for new trial. (Doc. No. 234.) The parties filed their replies on August 7, 2017. (Doc. Nos. 236-39.) The parties filed supplemental briefing on the matter of qualified immunity on August 11, 2017. (Doc. Nos. 240, 241.) On August 14, 2017, the Court held a hearing on the parties' post-trial motions and heard arguments from the parties. (Doc. No. 242.) Plaintiffs Lauren Taylor, C.L., and B.L. were represented by Attorney Robert Powell. Plaintiff Michael Lewis was represented by Attorney Stephen Allen King. Defendants were represented by Attorneys David Brodie and Erica Cortez.

On August 8, 2011, Defendants Ian Baxter and Nancy Quinteros, social workers for the County, visited the home of Plaintiffs Michael Lewis and Lauren Taylor, parents of C.L. and B.L. (II-111:25-112:12.)[1] Baxter and Quinteros were responding to a referral from the Coronado Police Department, which had previously visited the home and observed a marijuana processing lab, along with a large volume of marijuana, marijuana derivatives, and marijuana paraphernalia. (II-10:7-9, II-30:13-19, II-24:17-20, II-32:24-33:5, II-54:17-21, II-81:20-82:1.) After observing the home and interviewing Plaintiffs, Baxter and Quinteros, at the instruction of their supervisor Benita Jemison, removed the children. (II-250:17-251:4, II-120:6-7, III-238:12-7, III-273:14-17.)

Plaintiffs proceeded to trial against the county social workers, arguing the social workers violated their Fourth and Fourteenth Amendment rights by removing C.L. and B.L. from their home without a warrant. Plaintiffs also claimed Defendant County of San

---

[1] For purposes of convenience, citations to the trial record will be according to the Volume Number. Citations will be of the format Vol-Page:Line. For example, II-111:25 is a citation to the Second Volume, page 111, line 25. The volumes are located at ECF Document Nos. 210-214.

Diego (the "County") was liable under <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978). Defendants maintained that there had been no constitutional violation because the children were in imminent risk of serious bodily harm, there was insufficient time to seek a warrant, and there were no less restrictive alternatives.

At the end of trial, the jury rendered a verdict in favor of individual defendants Quinteros, Baxter, and Jemison. (Doc. No. 201, Special Verdict Form 1.) On Special Verdict Form 1, the jury found that Defendants Ian Baxter and Nancy Quinteros' actions in removing Plaintiffs C.L. and B.L. were not unreasonable and, thus, they had not violated Plaintiffs' Fourteenth or Fourth Amendment rights. (<u>Id.</u>, Qs. 1, 7, 14.) The jury concluded that Jemison's actions constituted an unreasonable interference with Plaintiffs' rights of familial custody and companionship under the Fourteenth Amendment, but that Jemison had not acted with deliberate indifference. (<u>Id.</u> Qs. 7, 8.) The jury also concluded that Jemison's actions were intentional and unreasonable under the Fourth Amendment, but were not the legal cause of Plaintiffs' injuries. (<u>Id.</u> Qs. 1, 2.)

The Court instructed the jury to "[c]omplete Special Verdict Form 2 only if you found a violation of the Fourth and/or Fourteenth Amendment claim against a defendant in Special Verdict Form 1." (Doc. No. 202, Special Verdict Form 2; IV-210:1-7.) Despite the Court's instruction to only complete Special Verdict Form 2 if they found a constitutional violation by an individual defendant, the jury proceeded to complete Special Verdict Form 2. (<u>Id.</u>) The jury found that the individual Defendants had acted pursuant to an expressly adopted official policy or longstanding practice or custom of the County, but found such policy, practice, or custom was not the moving force that caused Plaintiffs' injury. (<u>Id.</u> Qs. 1, 2.) Next, the jury found that Defendant County of San Diego had failed to adequately train its social workers to prevent violations of the Constitution when handling usual and recurring situations. (<u>Id.</u> Q. 3.) The jury also concluded the County had been deliberately indifferent to the known or obvious consequences of its failure to train social workers, (<u>id.</u> Q. 4), and that this failure to train was so closely related to the deprivation of a plaintiff's rights as to be the moving force

that caused the injury, (id. Q. 5). The jury awarded nominal damages in the amount of $1 per Plaintiff. (Id. Q. 7.)

After reviewing the verdict forms, outside of the presence of the jury, the Court noted the inconsistencies and asked for the parties' advice. (V-13:7-15:12.) Plaintiffs' counsel acknowledged the inconsistency but concluded "we can leave it for motions." (V-13:13-21.) Defendants' counsel took the position that "as a matter of law, [the jury] could not have reached the second verdict form." (V-13:22-14:4.) The Court, however, noted that the inconsistency could be reconciled in different ways:

> But what if [the jury] intended this so that there's a message sent? So the Court on post-trial motions could either say that the legal cause as to Jemison is sufficient and so, therefore, they get their attorneys' [fees] and the dollar injury and the County has to change its policy or the County – or the Court adopts your view that they couldn't get to Special Verdict Form 2 but because our introductory instructions led them to believe that they could, they might think that they're doing something that they wouldn't have – maybe they would found differently on the legal cause, the moving force.

(V-14:5-16.) In response, Defendants' counsel maintained his position that the matter did not need to be resubmitted to the jury, but was appropriately handled via post-trial motions:

> I think that it is a matter for post-trial motions, and that will be our position that the Court should strike the verdict on the second form. I don't think the jury has to do anything differently at this point.

(V-14:16-24.) Plaintiffs' counsel agreed: "I think we can deal with it in post-trial motions." (V-15:1-2.) The Court then confirmed that this was how the parties wanted to proceed:

> THE COURT: So do you want this jury to do any further clarification or just leave if for post-trial motions?
> MR. POWELL [For Plaintiffs]: Post-trial motions.

4

MR. BRODIE [For Defendants]: I agree.

THE COURT: All right. Thank you. Then we'll bring out the jury. (V-15:7-12.) And with that, the Court thanked the jury for their service and dismissed them. The parties subsequently filed the post-trial motions now before the Court. (Doc. Nos. 215, 218, 219, 225, 229, 230, 240.)

## DISCUSSION

## I. LEGAL STANDARDS

### A. RULE 50

Courts may grant judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). In ruling on a motion for judgment as a matter of law, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in their favor. Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006). Judgment as a matter of law is only proper if "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Id. (citing Pavao v. Pagav, 307 F.3d 915, 918 (9th Cir. 2002).

### B. RULE 59

After a jury trial, courts may grant a motion for new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Grounds for a new trial include "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940). The Ninth Circuit has further explained that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 510 n. 15 (9th Cir. 2000)).

## II.  **ANALYSIS**

### A. The Jury's Verdict Is Supported By The Evidence

The parties both challenge the jury's conclusions.  Plaintiffs move for new trial as to all Defendants, arguing that the jury's verdict finding the individual defendants not liable and the County only liable for a failure to train is against the clear weight of the evidence.  (Doc. No. 215 at 7.)  Defendants, on the other hand, move for judgment as a matter of law as to the County, arguing that the jury's verdict against the County as to their failure to train has no legally sufficient basis.[2]  (Doc. No. 229.)  After reviewing the evidence presented at trial, and in light of the applicable legal standards controlling the parties' motions, the Court denies the motions.  The jury heard the evidence and rendered a reasonable verdict supported by substantial evidence.  U.S. v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999) ("a district court may not grant or deny a new trial merely because it would have arrived at a different verdict"); Josephs, 443 F.3d at 1062 (judgment as a matter of law only proper if jury's verdict was unreasonable).

#### 1.  JURY'S CONCLUSIONS AS TO BAXTER, QUINTEROS

The jury found that Defendants Baxter and Quinteros had not acted unreasonably in removing C.L. and B.L. from their home.  (Doc. No. 201, Qs. 1, 7, 14.)  Social workers may remove children from the home without a warrant if the information they possess at the time of the seizure provides reasonable cause to believe that the child is in imminent danger of serious bodily injury, is likely to experience serious bodily injury in the time that would be needed to obtain a warrant, and the scope of the intrusion is reasonably

---

[2] Plaintiffs moved to strike Defendants' post-trial motions.  (Doc. No. 225.)  Defendants timely filed their post-trial motions under Federal Rules of Civil Procedure 50 and 59 and amended the briefing consistent with the Court's scheduling order.  (Doc. Nos. 218, 219; see Doc. No. 220; V-19:5-20:9.)  At the end of trial, Plaintiffs raised no objections to the Court's proposed scheduling order.  (V-19:5-20:9.)  Furthermore, Plaintiffs were on notice as to the substance of Defendants' motion and have not alleged prejudice.  See McGarr v. Hayford, 52 F.R.D. 219, 221 (S.D. Cal. 1971) ("if the court can comprehend the basis of the motion and deal fairly with it, technicalities ought to be avoided"); King v. Mordowanec, 46 F.R.D. 474, 477 (D. R.I. 1969) (holding that a motion had sufficient specificity under Fed. R. Civ. P. 7 because the grounds for the motion had been stated at oral argument).

necessary to avert that specific injury.  <u>Rogers v. County of San Joaquin</u>, 487 F.3d 1288, 1294 (9th Cir. 2007); (<u>see also</u> Doc. No. 200, Jury Instructions Nos. 16, 17, 19).  The jury's finding, that Baxter and Quinteros did not act unreasonably, is not against the clear weight of the evidence.

Baxter and Quinteros visited Plaintiffs' home in response to a referral from the police.  (II-107:15-108:25.)  The police originally visited Plaintiffs' home in response to a complaint by someone who said they had seen the occupants of the home smoking marijuana while children were in the home and the occupants ran a day care at the residence.  (II-10:7-9, II-30:13-19; II-30:10-32:23.)  Officer Hurley, the police officer who investigated the complaint and made the referral to Child Protective Services, testified that he observed a marijuana manufacturing lab—along with substantial amounts of marijuana, marijuana derivatives, and marijuana paraphernalia—in the home.  (II-10:7-9, II-30:13-19, II-24:17-20, II-32:24-33:5, II-54:17-21, II-81:20-82:1.)  This included hash oil, (II-17:1-4), containers with hash oil and marijuana residue, (II-18:1-2, II-47:11-13), containers of frozen marijuana buds and leaves in the freezer, (II-18:2-3, II-43:20-21), a bucket of water that appeared to be a mixture of marijuana and marijuana oil, (II-18:3-5, II-43:17-19), multiple propane or butane bottles, (II-18:4-8), a butane torch, (II-39:22-23), a grinder with marijuana residue, (II-37:22), and a scale, (II-18:6).  (See also II-32:7-19.)  The jury saw pictures of the conditions at the time and those conditions had not changed when the social workers arrived at the residence three days later.  (II-33:9-34:12; <u>see also</u> III-86:14-22, 93:13-23, 94:21-22; III-248:25-249:9.)

Officer Hurley testified that he was familiar with marijuana extraction labs and Plaintiffs' home contained equipment similar to that which he had observed previously in marijuana butane honey oil labs.  (II-40:12-19.)  This extraction method used butane to extract THC, creating an extremely volatile liquid in the process.  (II-40:23-41:2.)  Officer Hurley stated that these types of labs were immediately dangerous to young children because of the risk of inhaling fumes and explosions.  (II-41:3-15.)  The extraction process Officer Hurley observed, as well as the equipment for the butane

honey oil method, was located in the kitchen, with many objects resting uncovered on the kitchen counter. (II-17:1-4, 18:1-5, 47:11-13, 47:11-13, 40:12-19.) Officer Hurley did not observe a baby gate in Plaintiffs' home during his investigation. (II-18:18-21.)

Officer Hurley observed two pounds of frozen marijuana buds in an ice cream bucket in the freezer. (II-43:15-21.) Based on his experience and training as an officer, Officer Hurley testified that marijuana buds contain a much higher THC content than marijuana leaves. (II-43:23-44:6.) And given the proximity of these buds to food in the freezer, Officer Hurley was particularly concerned about the possibility of cross-contamination or ingestion by the children. (II-44:7-13.)

Based on what he saw at Plaintiffs' home, Officer Hurley was concerned about the safety of any children in the home and contacted Child Protective Services ("CPS") to report his findings. (II-24:17-20, II-54:17-21, II-81:20-82:1.) The referral stated:

> Officer O'Neal and I were stopped by a citizen . . . [who] told us he wanted to remain anonymous but that in apartment 2 of 1010A, the adult residents were smoking marijuana at the house when the children were present, and the occupants of the residence ran a daycare at the residence. At about 1433 hours, Officer O'Neal and I made contact at the front door with Michael Lewis . . . . While searching the house, I located a marijuana grow inside the bedroom closet consisting of six semi-mature plants, one non-mature plant, and eight seedlings. In Lewis' bathroom I located marijuana hash [] and marijuana paraphernalia in a wall cabinet located about six feet about the – six feet about (sic) the floor. In the kitchen freezer I located approximately two pounds of frozen marijuana buds along with five plastic grocery bags of marijuana leaves . . . . On the kitchen counter I located marijuana hash, hash oil, and hash water along with two scales and items that filter and clean the marijuana and marijuana hash. On top of the refrigerator I located an approximately five gallon jug containing about one gallon of marijuana water. I also located a propane bottle and a top-mounted cabinet on a

3:13-cv-02818-H-JMA

dresser in the living room.  It is unknown but appeared the items in the kitchen were not moved when the children are home.

(II-30:10-32:23.)  In addition to Officer Hurley's description, the referral included a special project code to assess the home for "DEC," which stands for Drug Endangered Children.  (II-108:20-25.)  Although there were no children present when Officer Hurley was at Plaintiffs' home, he testified that had there been, and he determined they had access to the hash oil and marijuana, he could have arrested someone for child endangerment.  (II-54:25-55:3.)

After CPS received Officer Hurley's report, social worker Ian Baxter was assigned to the case and, after reviewing the referral, was instructed to go assess the home environment.  (II-109:22-24, 111:16-18.)  Nancy Quinteros was completing on-the-job training at that time and joined Baxter.  (II-112:9-17.)  Upon arrival at Plaintiffs' home, Baxter and Quinteros observed the home in much the same condition as Officer Hurley had described.  (III-249:11-252:25.)  Indeed, Lewis testified that he did not clean up his marijuana processing setup after his visit from Officer Hurley and everything was the same when Baxter arrived three days later.  (III-86:14-22, 93:13-23, 94:21-22.)  Baxter testified there were Pyrex dishes with concentrated marijuana, extraction equipment, frozen marijuana buds and leaves in the freezer, a bucket of marijuana residue and water, hash oil, butane bottles, a butane torch, and vials for the hash oil.  (III-249:11-252:25.)  Many of these items were laying on the kitchen counter.  (Id.)  Baxter investigated the marijuana grow, noting a sophisticated lighting system with "cords kind of hanging all over."  (III-246:20-23.)  Baxter also noted that the closet door, where the grow was located, did not have a lock.  (III-247:10-11.)  Baxter took pictures of the home as he found it, which were provided to the jury.  (III-248:25-249:9.)

In addition to observing the physical environment, Baxter and Quinteros conducted an investigation.  Baxter interviewed Taylor and attempted to be thorough, covering all aspects of abuse and neglect.  (III-244:14-15.)  Baxter asked Taylor about the various forms of marijuana and marijuana paraphernalia lying around the home and Taylor told

9

him it was because Lewis had been "cooking last night." (II-118:19-25.) Baxter also spoke to the children and C.L. told him that "his dad eats stinky broccoli," which Baxter interpreted to mean that Lewis ate some form of marijuana. (III-269:2-8.) During part of the investigation, Lewis was occupied with a telephone interview, but both Baxter and Quinteros spoke with him. (I-112:1-4, II-186:6-8, II-254:1-9, III-70:22-71:7.) After completing the investigation, Baxter called his supervisor, Jemison, to discuss his findings. (III-237:12-16, III-255:13-17.) After hearing Baxter's description of the situation, Jemison instructed Baxter to remove the children. (II-121:11-12.)

Plaintiffs' home contained a substantial amount of marijuana, marijuana derivatives, and marijuana extraction equipment. Indeed, Plaintiffs stipulated to the presence of many of the items, including the hash oil, a $CO_2$ tank, the extraction tank, the marijuana buds and leaves in the freezer, the bucket with marijuana, the butane canister, marijuana plants, and extraction equipment. (III-135:12-138:6.) And the jury was presented with photographic evidence taken by both Officer Hurley and Baxter, showing the condition of the home. (II-33:9-34:12, III-248:25-249:9.)

Based on the evidence, a jury could conclude that the conditions posed a danger to the children and the parents were unlikely to remedy the potential risk of harm to the children. When Officer Hurley visited Plaintiffs' home, he testified that he had not seen any baby gate preventing the children from accessing the marijuana manufacturing process in the kitchen. (II-18:18-21.) Baxter and Quinteros also testified that they did not see any baby gate. (III-248:17-18, 281:19-25.) In addition to the absence of a baby gate, Baxter testified that he observed a step ladder in the kitchen, next to the refrigerator, by which the children could access the freezer or the kitchen counter; both of which contained marijuana. (III-250:1-2, 12-14, 254:5-9.) As such, Baxter testified he was concerned about the possibility of C.L. and B.L. gaining access to and ingesting the marijuana. (II-243:14-24, II-246:21-23, III-274:7-10.) Furthermore, Quinteros testified that C.L. and B.L. were very active and were "climbing all over" when she was with

3:13-cv-02818-H-JMA

Baxter at Plaintiffs' residence. (III-283:7-10.) The video of the residence supported this testimony. (E.g., III-206:11-207:9.)

The jury could reasonably conclude that access to the marijuana and marijuana derivatives posed a danger to the children. Defendants' expert, Dr. Geller, testified that hash oil contains a concentrated amount of cannabinoids, posing a significant problem for children if ingested. (III-153:20-22, III-158:16-21 (could cause "serious harm").) As he put it: "[i]t's entirely plausible that hash oil itself, if a child were to put their hand in it and then put their hand in their mouth, it's entirely possible to have an adverse effect." (III-153:24-154:2.) Plaintiffs' expert, Dr. Bearman, similarly testified that edible marijuana poses a particular problem with regards to children, because it raises the risk they will ingest it. (III-15: 8-17.) And Taylor testified that the marijuana in the freezer was adjacent to food items, like a Kit Kat bar. (III-203:5-10.)

The jury could also reasonably conclude that the marijuana extraction process posed a danger to the children. Matt Stevens, a Deputy Sheriff with the Narcotic Task Force, testified regarding his experience with marijuana extraction labs he has investigated over the years. (IV-55:17-21.) Stevens testified that there are generally three types of chemical extracting methods: blasting, closed-loop, and super critical. (IV-55:1-5.) The blasting method uses butane as its chemical solvent and butane is highly flammable. (IV-59:16-60:15.) Stevens testified that pictures he reviewed from Plaintiffs' home contained equipment consistent with the blasting method of marijuana extraction and it appeared that the equipment had been used accordingly. (IV-62:8-63:4, 65:14-66:11.) Lewis testified that he had previously extracted THC from marijuana using the butane blasting method. (III-91:17-92:7, III-141:14-17.) Dr. Geller testified that this method of THC extraction can create a very dangerous situation in homes due to its low boiling temperature and explosive nature. (III-154:16-25.) At the time of his investigation, Baxter testified he was concerned about the danger of explosions due to chemicals involved with drug labs. (III-256:15-20, 257:1-7.) And in retrospect, Baxter testified that he should have called the DEA, based on the presence of marijuana oil, the

3:13-cv-02818-H-JMA

extraction tube, the Pyrex dishes, the honey oil wax, the shaved marijuana buds, and the marijuana plants, and request a hazmat team come out and assess the home. (II-216:9-13, 219:17-21.)

The jury could reasonably conclude that Baxter and Quinteros felt there was insufficient time to obtain a warrant. The jury heard testimony from multiple witnesses to the effect that getting a warrant for removal of a child takes at least 48 hours. (II-102:6-10, 183:10-11, IV-9:14-16, 10:15-22, 13:3-4.) Baxter testified that, at the time, Taylor did not appear to appreciate the danger posed by the marijuana in the home. (III-260:15-19.) Taylor was aware of the marijuana adjacent to food items in the refrigerator, (III-203:5-10), and was aware of the marijuana grow in the unlocked closet, (III-201:18-23), but did not address the problems. At trial Taylor testified that the worst thing she thought could happen if one of her children ingested marijuana was that "they would probably get the munchies and want to sleep." (III-195:4-9.) Baxter testified that he did not want to leave the children in the home for that amount of time, given the access to the marijuana and the parents' failure to appreciate the danger of the situation. (III-258:11-22; see also III-296:11-14 (Jemison testified that she was concerned the children would just be re-exposed to the same hazardous environment if they simply required Taylor leave the home with the children).) And for the same reasons, the jury could conclude that the social workers did not have sufficient time to investigate whether taking the children to Taylor's sister's home was feasible. (III-271:19-23 (Baxter's testimony that there was insufficient time to investigate the sister), III-302:9-20 (Jemison testifying it would take more than 24 hours to assess the sister's protective capacity).)

The jury conclusions were also supported by the training Baxter and Quinteros received. For example, Defendants' Person Most Knowledge ("PMK") on Emergency Responsive Investigations testified that social workers needed to assess whether marijuana was accessible to the children because of the possible effects on the child from ingesting marijuana. (I-210:3-18, I-268:16-269:4.) Similarly, social workers training regarding DEC referrals supported Baxter and Quinteros' conclusion. Defendants' PMK

testified that DEC referrals are made when a child's care giver is using, abusing, selling, or manufacturing drugs. (I-205:6-15.) And social workers had experience consulting with law enforcement regarding possible drug labs and would take a law enforcement officer's representation that a home contained a manufacturing lab into consideration. (I-277: 8-16.)

Finally, there was no evidence presented that Baxter and Quinteros removed the children solely on account of the presence of marijuana. Defendants' PMK testified that that there was no County policy that required social workers to automatically remove children if marijuana was found in the home. (I-209:15-24, I-268:5-7.) Social workers were instructed to treat medical marijuana the same as alcohol; they should assess whether the children have access to it and whether it is impacting the parents' ability to care for the children. (I-238: 10-16, I-267:12-19.) Baxter testified he was in favor of medical marijuana, (II-226:24-25), and his mother had a medical marijuana card for a medical condition, (III-276:7-11). Baxter testified he was aware of the dangers of removing a child from their home but still felt it necessary. (II-211:17-19, III-259:23-25.) And at trial, the jury heard Baxter's specific reasons for determining the children should be removed:

> That the children had access to the marijuana being grown in the bedroom, that the children had access to the manufacturing lab in the kitchen, all the materials used, to the concentrated cannabis, the hash oil, to the marijuana that was in the freezer, to the marijuana leaves that were in the freezer and that there's a – the parents lacked knowledge of the dangers of manufacturing the marijuana, keeping it in the home, and the criminal element that can be brought around when that kind of stuff is – activity is going on in the home."

(II-250:17-251:4; see also III-238:12-17, III-273:14-17.) In light of this evidence, the jury's decision was not against the clear weight.

///

13

## 2. JURY'S CONCLUSION AS TO JEMISON

The jury concluded that Jemison had not acted with deliberate indifference as to the Fourteenth Amendment claim. (Doc. No. 201, Q. 8.) Plaintiffs argue this is contrary to the clear weight of the evidence. (Doc. No. 215-1 at 17.) Defendants argue that the evidence offered at trial did not show deliberate indifference. (Doc. No. 234 at 15.) The Court agrees with Defendants.

The jury was instructed that "[d]eliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result." (Doc. No. 200, Jury Instruction No. 19); accord Gantt v. City of Los Angeles, 717 F.3d 702, 707 (9th Cir. 2013). At trial, Jemison testified that she was well aware of the negative impacts of removing children from the home and took that into consideration when deciding whether to remove the children. (II-98:19-99:13, III-297:19-22.) In her words, "we never want to remove children from parents. But when we feel that the children will not be safe, that's the only alternative we have." (II-123:9-12.) Jemison also testified that she never removed children from their parents for punitive reasons. (III-297:23-25.)

A jury could conclude that C.L. and B.L. were at risk based on the environment in their home. Jemison testified that Baxter told her everything he saw when they spoke on the phone. (III-293:13-25.) This included describing the marijuana processing lab, including the compressed gas canisters and Pyrex dishes with hash oil, the large volume of marijuana and marijuana derivatives, the presence of marijuana in the freezer next to food items, and the extraction equipment. (Id.) And Jemison testified that she thought the environment was unsafe for C.L. and B.L., which is why she ultimately removed them. (III-298:6-10.)

Furthermore, the jury heard testimony from Jemison as to why she chose to remove the children, rather than adopting some less intrusive means. Jemison testified that she thought, based on what Baxter told her, that Taylor did not appreciate the danger

the marijuana processing lab posed for her children; "[Taylor] didn't feel that anything was wrong with it." (III-295:24-296:6.) As a result of this failure to appreciate the danger, Jemison was concerned that less intrusive means might not be sufficient: "I felt like if [Taylor] did leave the home with the children, that the children would still be re-exposed to the same environment because she didn't think there was a problem." (III-296:4-10.) Jemison also testified that she did not think there was enough time to seek other remedies. For example, Jemison testified that Taylor offered to take C.L. and B.L. to Taylor's sisters' home but there was no way to know what the sister's protective capacities were and investigating the sister would take more than 24 hours. (II-122:14-15, III-302:6-20.) Similarly, Jemison testified that seeking a warrant would take at least 48-hours. (II-102:6-10, II-183:10-11.) In light of Jemison's testimony, the jury could reasonably conclude that she was not deliberately indifferent.

### 3. QUALIFIED IMMUNITY

Defendants asserted qualified immunity as a defense to individual liability for Jemison, Baxter, and Quinteros in their response to Plaintiffs' motion for summary judgment. (Doc. No. 97.) At the time, the Court declined to address the issue in light of the disputed facts. (Doc. No. 101 at 6 n.2.) Defendants re-raised the issue during trial, (Doc. No. 185), and renewed their motion for qualified immunity as to the individual Defendants after the verdict, (Doc. No. 240). The Court permitted additional briefing on the issue, citing the recent cases S.B. v. County of San Diego, -- F.3d --, 2017 WL 1959984 (May 12, 2017 9th Cir.), and Kirkpatrick v. County of Washoe, 843 F.3d 784 (9th Cir. 2016). (Doc. No. 235; see also Doc. No. 241.)

Government officials are shielded from money damages unless (1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). "To be clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand what [the official] is doing violates that right." S.B. v. County of San Diego, -- F.3d --, 2017 WL 1959984, *7 (9th Cir. 2017) (quoting Anderson v.

Creighton, 483 U.S. 635, 640 (1987)) (internal quotation marks omitted) (alterations in original). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quoting Mullenix v. Luna, 136 S.Ct. 305, 308 (2015)). "[T]he clearly established inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. The general principles regarding a child's Fourth Amendment rights against warrantless removals are settled: the child may not be removed without a warrant unless there are exigent circumstances. See Rogers, 487 F.3d at 1294. The clearly established analysis, however, requires the Court assess the Plaintiffs' rights under the specific circumstances of this case. al-Kidd, 563 U.S. at 735; S.B., 2017 WL 1959984, *5 (instructing courts not to focus on "broad general proposition[s]").

Here, social workers removed children from a home containing a marijuana processing lab. Social workers encountered marijuana processing equipment used in the butane blasting method, which experts testified involved highly flammable gasses and was dangerous. (IV-65:9-11, IV-60:12-18.) The social workers also encountered a substantial amount of marijuana and concentrated marijuana derivatives. (II-31:18-32:23 (police referral detailing the presence of 15 marijuana plants, marijuana hash, two pounds of frozen marijuana buds, five plastic bags of marijuana leaves, hash oil, and marijuana paraphernalia), II-219:17-19 (Baxter's testimony that he observed the presence of marijuana oil, an extraction tube, Pyrex dishes containing honey oil wax, shaved marijuana buds, and marijuana plants), II-17:1-43:25 (testimony of Officer Hurley describing pictures he took of the home, showing it contained marijuana plants, marijuana being dried, hash oil in Pyrex dishes on the counter, bags of marijuana in the freezer, marijuana buds, and marijuana processing paraphernalia).) Plaintiffs admit that Lewis was actively processing marijuana into a concentrated form of cannabinoids, and this hash oil was present on the kitchen counter, uncovered. (III-58:20-61:25 (Lewis testimony describing how he processed his marijuana and the state of the process when Baxter and Quinteros were present).) Lewis also admitted to using the butane method in

16

the past, (III-91:17-92:7, III-141:14-17), which experts testified was dangerous and created a risk of explosion, (II-41:3-15, III-154:16-25).

The Court can find no cases that would give a social worker "fair notice" that removing children from a home with a potentially dangerous marijuana lab and access to the concentrated marijuana and marijuana derivatives violated their Fourth Amendment rights. See Mullenix v. Luna, 136 S.Ct. 305, 314 (2002). California courts have held that children cannot be removed on the basis of marijuana use alone. See In re Alexis E., 171 Cal.App.4th 438, 453 (2009) ("use of medical marijuana, without more, cannot support a jurisdiction finding"). But marijuana use by the parents was not the primary risk the social workers relied on in removing the children. (See II-250:17-251:4.) At trial, Baxter articulated his specific reasons he felt the children were in imminent risk of serious bodily injury:

> "That the children had access to the marijuana being grown in the bedroom,
> that the children had access to the manufacturing lab in the kitchen, all the
> materials used, to the concentrated cannabis, the hash oil, to the marijuana
> that was in the freezer, to the marijuana leaves that were in the freezer and
> that there's a – the parents lacked knowledge of the dangers of
> manufacturing the marijuana, keeping it in the home, and the criminal
> element that can be brought around when that kind of stuff is – activity is
> going on in the home."

(Id.; see also III-238:12-17, III-273:14-17.) These concerns go beyond a parent's use of medical marijuana.

Plaintiffs rely on Rogers in support of their argument that Plaintiffs' rights were clearly established at the time, but Rogers is factually distinct. 487 F.3d at 1288. There, the Ninth Circuit held that unsanitary conditions in the home—including messy living quarters, small amounts of feces, and evidence of bottle rot—were insufficient to justify a warrantless removal. Id. However, Rogers does not place the constitutional question raised here "beyond debate." S.B., 2017 WL 1959984, *7. Here, the condition of

Plaintiffs' home went way beyond merely being unsanitary.  Officer Hurley testified that he observed an extraction device in Plaintiffs' home, of the type he had previously seen in butane honey oil labs.  (II-40:12-19.)  Officer Hurley stated that these types of labs posed risks of inhaling the butane fumes and explosion.  (II-41:15.)  These concerns were supported by the numerous containers of compressed gas the social workers encountered.  (E.g., III-135:12-138:6.)  Furthermore, social workers were concerned about the children's access to marijuana and concentrated marijuana derivatives.  (III-274:7-10.)  Marijuana is still a controlled substance, see 21 C.F.R. 1308.11 (classifying tetrahydrocannabinols ("THC") as a Schedule I narcotic), and experts testified that children could be negatively affected by ingesting it.  (III-153:20-22, III-158:16-21.)  Now that the record is fully developed, the Court concludes that Jemison did not violate any clearly established right of Plaintiffs and is, thus, entitled to qualified immunity.[3]

### 4. Inconsistent Or Surplusage Verdict

Although Jemison is entitled to qualified immunity, this does not disturb the jury's findings against the County.  As the Supreme Court explained in Owen v. City of Independence, Mo., 445 U.S. 622 (1980), municipalities are not entitled to qualified immunity under § 1983.  Id. at 657-58.  As such, Monell liability is unaffected by a finding of qualified immunity.  E.g., Kirkpatrick v. County of Washoe, 843 F.3d 784, 793 (9th Cir. 2016) (reversing district court and granting social workers qualified immunity but remanding for Monell inquiry).

Defendants move to set aside the County's Monell liability arguing that the jury never should have reached Special Verdict Form 2.  (Doc. No. 230 at 4.)  On Special Verdict Form 1, the jury concluded that Jemison's actions in removing C.L. and B.L. were intentional and unreasonable, (Doc. No. 201, Q. 1), but she was not the legal cause of C.L. and B.L.'s injuries, (id. Q. 2).  The Court's instructions regarding Special Verdict

---

[3] While the Court need not reach whether qualified immunity applied to Baxter and Quinteros because the jury did not find them liable, the Court sees no reason the analysis would differ.

3:13-cv-02818-H-JMA

Form 2 were to "[c]omplete Special Verdict Form 2 only if you found a violation of the Fourth and/or Fourteenth Amendment claim against a defendant in Special Verdict Form 1." (Doc. No. 202, Special Verdict Form 2; IV-210:1-7.) Despite finding no individual Defendants liable, the jury proceeded to Special Verdict Form 2 and concluded the County was liable for failing to train its social workers. (Doc. No. 202 Qs. 3, 4, 5.) Defendants argue that, because the jury ignored the Court's instructions, any answers on Special Verdict Form 2 should be disregarded as surplusage under Floyd v. Laws, 929 F.2d 1390 (9th Cir. 1991). Plaintiffs argue that they do not need to prove causation in order to establish Monell liability against the County. (See Doc. No. 233 at 4.)

Plaintiffs are wrong. The County of San Diego cannot be liable without an underlying constitutional tort. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 690 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); accord Santos v. Los Angeles County Dept. of Children and Family Servs., 200 Fed.Appx. 681, 683 (9th Cir. 2006) ("[T]here can be no *Monell* claim without a constitutional violation."). And "like common law torts, constitutional torts require causation." OSU Student Alliance v. Ray, 699 F.3d 1053, 1072 n. 12 (9th Cir. 2012); see also Ninth Circuit Manual of Model Jury Instructions Civil, § 9.8 Causation. As such, the jury's findings on Special Verdict Form 2 could be interpreted as inconsistent with their conclusions on Special Verdict Form 1.

For this reason, after the jury returned its verdict, the Court discussed the possible inconsistency with the parties and asked their preference for resolving it. (See V-13:1-14:25.) Defendants' asserted their position that "as a matter of law, [the jury] could not have reached the second verdict form." (Id. V-13:22-14:4.) The Court noted that the inconsistency could also be resolved by determining that the "legal cause as to Jemison is sufficient." (Id. at V-14:5-16.)

///

In any event, the parties agreed to allow the Court to resolve the matter, rather than asking the jury to deliberate further:

> THE COURT: So do you want this jury to do any further clarification or just leave if for post-trial motions?
>
> MR. POWELL [For Plaintiffs]: Post-trial motions.
>
> MR. BRODIE [For Defendants]: I agree.
>
> THE COURT: All right. Thank you. Then we'll bring out the jury.

(Id. at V-15:7-12.) In light of the parties' agreement that the proper course of action was for the Court to resolve the matter in post-trial motions, the Court will do so. The Court now turns to the jury's decision on legal causation as to Jemison.

### 5. LEGAL CAUSATION AS TO JEMISON'S FOURTH AMENDMENT VIOLATION

The jury concluded that Jemison's actions in removing C.L. and B.L. were intentional and unreasonable. (Doc. No. 201, Q. 1.) Neither party challenges this conclusion in their post-trial motions so the Court need not address it. (Doc. Nos. 215, 229, 230.) In any event, the jury's finding is not contrary to the clear weight of the evidence. Jemison testified that she was responsible for supervising Baxter and Quinteros and it was ultimately her decision to remove the children. (II-97:1-5, II-103:14-17, II-121:11-12) The jury heard testimony regarding Jemison's actions in this role, including testimony tending to show she never discussed the warrant requirement or less intrusive alternatives with Baxter because a warrant would take too long and the parents did not appreciate the dangers in the home. (E.g., II-122:1-5, II-123:2-12.) Similarly, the jury heard testimony tending to show Jemison did not ask Baxter to make follow-up inquiries regarding certain factual uncertainties as a part of the investigation. (E.g., II-119:5-14.) This was enough for a reasonable jury to conclude Jemison's actions were intentional and unreasonable.

///
///
///

3:13-cv-02818-H-JMA

While the jury concluded that Jemison had acted intentionally and unreasonably in removing C.L. and B.L., (Doc. No. 201, Q. 1), they found that she was not the legal cause of their injuries, (id., Q. 2). With the concurrence of the parties, the Court had instructed the jury as follows:

"[i]n order to establish that the acts of defendants Ian Baxter, Nancy Quinteros, Benita Jemison and/or the County of San Diego deprived the plaintiff of his or her particular rights under the United States Constitution, the plaintiff must prove by a preponderance of the evidence that the acts were so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury."

(Doc. No. 200, Instruction No. 22.) The Court discussed this causation instruction with the parties and neither side objected or requested an instruction on substantial factor at that time.[4] (II-280:14-18.); see U.S. v. Tirouda, 394 F.3d 683, 688 (9th Cir. 2005) (party must object to jury instruction to preserve review).

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party." Fed. R. Civ. P. 50. "Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007).

At the time of C.L. and B.L.'s removal, Jemison was the supervisor of the Emergency Response Unit with the County of San Diego Health and Human Service Agency. (II-96:6-97:8.) Jemison received the referral from the Coronado Police

---

[4] Model Jury Instruction 9.4 applies to § 1983 claims against a supervisory defendant in her individual capacity. Manual of Model Civil Jury Instructions, § 9.4 (2007 ed.). This instructs a jury that plaintiff must prove that "[t]he supervisory defendant's conduct was so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury." Id. In any event, neither party objected to the instructions on causation at the time.

Department regarding the Lewis' home and assigned Defendant Baxter to investigate. (II-105:20-106:8.)

After Baxter conducted his initial investigation at the Lewis home, he phoned Jemison to discuss the matter. (II-116:13-15.) Jemison testified that she did not instruct Baxter to make any follow up inquiries, (II-119:12-14), did not discuss the possibility of obtaining a warrant because it took so long, (II-122:1-5), and did not discuss any alternatives to removal because the parents did not appreciate that there was a problem, (II-123:17-20). At the conclusion of her conversation with Baxter, Jemison instructed him to remove the children. (II-121:11-12 ("Q: And so what was that conclusion? A: Based on the fact that no one seemed to think it was a problem, I instructed him to remove the children.").)

Plaintiffs claim their injury stems from the warrantless removal of C.L. and B.L. (E.g., Doc. No. 1, Complaint ¶ 1.) Given that Jemison ordered this removal, (II-121:11-12), a jury should conclude she was the moving force that caused the injury. Fed. R. Civ. P. 50(a). In light of this conclusion, the jury did not err in proceeding to Special Verdict Form 2, as the necessary predicates of Monell liability were established. Thus, the Court denies the County's motion to set aside the jury's verdict. (Doc. Nos. 218, 230.)

### 6. JURY'S CONCLUSIONS AS TO THE COUNTY

#### i. Official Policy Claim

As to Plaintiffs' official policy claim, the jury found that the social workers had been acting pursuant to an expressly adopted policy or longstanding practice or custom of the County when they removed C.L. and B.L., but that official policy or longstanding practice or custom was not the moving force that caused Plaintiffs' injury. (Doc. No. 202, Qs. 1, 2.) As to Plaintiffs' inadequate training claim, the jury found that the County failed to adequately train its social workers to prevent violations of the Constitution when handling usual and recurring situations, was deliberately indifferent to the known or obvious consequences of its failure to train social workers, and the failure to train was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that

caused the injury.  (Id., Qs. 3, 4, 5.)  The jury awarded each Plaintiff nominal damages of $1.  (Id., Q. 7.)

Plaintiffs argue the clear weight of the evidence showed that two County policies caused their rights to be violated: (1) the ER Authority to Take Custody of a Child ("ER Policy") and (2) the DEC Policy.  (Doc. No. 215-1 at 19, 15.)  Defendants argue that Plaintiffs have taken the policies out of context and, in any event, Plaintiffs have offered no proof that the ER Policy or the DEC Policy were relied on in removing C.L. and B.L.  (Doc. No. 234 at 16-21.)  The court agrees with Defendants, the verdict is not contrary to the clear weight of the evidence.

### a. ER Policy

Plaintiffs argue that the ER Policy improperly states the legal standard for removal and that, as a result, the social workers failed to apply it.  (Doc. No. 215-1 at 19-20.)  The ER Policy was presented at trial and entered as an exhibit.  (II-160:13, et seq.; see Doc. No. 197.)  On this first page of the ER Policy, it states that

> A SW, in consultation with his PSS, should consider the temporary removal
> of a child from the parent's physical custody when:
>
> - There is substantial danger to the physical health or safety of the child
>   and the parent appears unable to protect the child.
>
> . . . .

(Doc. No. 215-5 at 2.)  Plaintiffs argue that the ER policy fails to provide the appropriate legal standard as set forth in Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000).  Plaintiffs acknowledge that the ER Policy does contain a section entitled "Imminent Danger" but maintains that the definition of imminent danger used—"strong risk of injury/reinjury with service or before services can be provided"—is not the appropriate standard.  (Doc. No. 215-1 at 19-20.)  Plaintiffs argue that because the ER Policy contains an incorrect legal standard, and was used to train the County social workers, it is the cause of Jemison and Quinteros' inability to articulate the appropriate legal standard while they were on the witness stand.  (Id.)

Defendants argue, in response, that Plaintiffs take portions of the ER Policy out of context and, when considered as a whole, the policy accurately instructs social workers on things to consider when contemplating removal. (Doc. No. 234 at 17-18.) Defendants note the long section entitled "Imminent danger" which states that "[w]hen children are in imminent danger (strong-risk of injury/re-injury with services or before services can be provided), the SW will immediately take whatever action is necessary to protect them." (Id. at 17.) Defendants also argue that there is no reason that the social workers should be able to recite verbatim the precise language from Wallis; rather, the question is if they applied it appropriately. (Id. at 19.)

The Court agrees with Defendants. At trial, Tami Snyder ("Snyder") testified as the Person Most Knowledgeable ("PMK") on the County's policies. (I-150:13-151:8.) Snyder testified that there were a large number of policies that social workers were trained on, totaling 15 chapters and over 2,000 pages. (I-197:10-12.) Plaintiffs' counsel presented Snyder with a copy of the ER Policy and reviewed various portions of it. (See I-160:13, et seq.) Although Snyder acknowledged that the term "imminent" did not appear on the front page of the policy, "Imminent danger" was a topic heading on the fourth page. (I-199:23-25; Doc. No. 215-5 at 5.) Snyder testified social workers were taught to assess danger via a safety assessment using structured decision making, taking into consideration various factors, and consulting with their supervisor. (I-201:1-6.)

At trial, the jury also heard testimony from John Phillips, an attorney with County Counsel's office who testified as to the training social workers received regarding the legal standards for removing children without a warrant. (IV-15:17-24, 16:5-7, 17:6-18.) Phillips testified that he also instructed social workers on assessing the home environment to determine whether there was exigency and discussed the various factors they should consider. (IV-17:6-18.) In light of Phillips' testimony, that social workers were separately trained about the appropriate legal standards for removing children without a warrant, the jury could find that the ER Policy did not cause any constitutional violations.

Furthermore, a reasonable jury could conclude that the ER Policy did not cause any constitutional violation in light of the testimony at trial. At trial, Baxter testified that he received the normal social work training and, as Plaintiffs concede, articulated the correct standard for warrantless removals as delineated in <u>Wallis</u>. (<u>See</u> Doc. No. 215-1 at 20; III-235:6-8.) In light of the evidence at trial, a reasonable jury could conclude that the ER Policy did not cause any constitutional violation.

### b. DEC Policy

Similarly, a reasonable jury could conclude that the DEC Policy did not cause the constitutional violation. At trial, Snyder also testified regarding the DEC Policy. (I-183:16 et seq.) Snyder testified that this policy had been last updated in 2010 and did not contain any information about medical marijuana. The portion that Plaintiffs' claimed caused the violation was a single line that read "Note, if a child is in a home where drugs and/or paraphernalia have been found and they were accessible to the child or children or the children have been exposed to the drugs, they should be brought into custody." (I-189:29.) Snyder testified that this line, if read in isolation, can be taken out of context and was not a fair description of the entire policy. (I-208:20-209:14.) Other portions of the DEC Policy stated that the "PSW [Protective Services Worker] will complete a full investigation" and "will assess if removal is necessary and appropriate under this protocol and consult with a Supervisor prior to removing the child." (Doc. No. 215-6 at 7-8.) Snyder testified that the County never had a policy of per se removal when marijuana was found in a home. (I-209:21-24.) Instead, social workers were supposed to "assess the situation, where it is kept, is it accessible to the children, where are people using it, are the children exposed to it, where is it kept when it's not being used, who's supervising the children, those types of things." (I-210:3-7.)

Snyder's explanation of the DEC Policy was supported by the testimony of the social workers. Jemison testified that marijuana use, on its own, did not justify removal:

Q: Did you approve the removal of the Lewis/Taylor children just because the father used medical marijuana?

A: No.

Q: Are you trained by the County of San Diego to remove children just because a parent uses medical marijuana?

A: No.

Q: Are you trained to remove a child solely because the parent uses any drug, legal or illegal?

A: No

(III-296:15-23.) Similarly, Baxter testified that there was no one thing that caused him to remove the children, rather it was the "totality of the situation." (E.g., II-235:7-9.) A reasonable jury could conclude that the DEC Policy did not cause any constitutional violation in light of the social workers' testimony that they did not rely on a the parents' medical marijuana use as a dispositive factor in removing C.L. and B.L. (III-296:15-17.) The verdict is also reasonable in light of the lack of evidence that any of the social workers relied on the DEC Policy provision in question in the removal decision.

### ii. *Failure to Train Claim*

As to Plaintiffs' failure to train claim, the jury found that the County had failed to adequately train its social workers, was deliberately indifferent in failing to train them, and the failure to train was the moving force that caused Plaintiffs' injuries. (Doc. No. 202 Qs. 3-5.) Defendants move for a judgment as a matter of law that that there was no legally sufficient evidentiary basis for these findings. (Doc. No. 229 at 2.) Plaintiffs oppose this motion, arguing that the jury was presented with a sufficient evidentiary basis to find against the County on the inadequate training claim. (Doc. No. 232 at 12.)

Federal Rule of Civil Procedure 50 provides that where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: . . . (B) grant a motion for judgment as a matter of law." Fed. R. Civ. P. 50. "The test applied is whether the evidence permits only one reasonable conclusion, and that

conclusion is contrary to the jury's verdict." Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006). The Court may not make credibility determinations or weigh evidence, but must view the evidence in the light most favorable to the non-moving party. Id.

To prove a Monell claim of inadequate training, Plaintiffs needed to show (1) the County's training policies were not adequate to prevent violations of law by its employees to handle the usual and recurring situations they deal with, (2) the County was deliberately indifferent to the known or obvious consequences of its failure to train, and (3) the County's failure to provide adequate training was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused the ultimate injury. (See Doc. No. 200, Jury Instruction No. 21); City of Canton, Ohio v. Harris, 489 U.S. 378 (1989). "The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizen's rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference.'" Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 409 (1997).

The jury heard testimony that social workers lacked training on marijuana, including medical marijuana. For example, Snyder testified that although the DEC Policy had been updated as recently as 2010, it failed to include any information whatsoever regarding medical marijuana or the Compassionate Use Act, which legalized medical marijuana. (I-183:7-20, 185:4-6.) Furthermore, Snyder testified that she had never given any training on the Compassionate Use Act and she never addressed the legalization of medical marijuana in any of the trainings she provided. (I-232:23-233:9.) Phillips, from County Counsel's office, also testified that he had never given any training regarding the Compassionate Use Act or marijuana extraction processes. (IV-37:2-4.) Similarly, the individual social workers testified to a lack of training regarding marijuana. Jemison testified that, at the time of removal, she had not received any training on the Compassionate Use Act or the legal methods for processing marijuana. (II-100:5-12, 114:12-15.) Jemison also testified that, although she was trained on the DEC Policy, she

had never received training on whether medical marijuana was subject to the DEC Policy. (II-105:3-10.) Furthermore, Jemison testified that she had not been properly trained on the significance of a medical marijuana card. (II-114:21-23.) Quinteros testified that, at the time of C.L. and B.L.'s removal, she had not received any training regarding the Compassionate Use Act, use of medical marijuana, or the legal methods for processing marijuana. (II-179:2-15.) Baxter also testified that, at the time of the removal, he did not have training on the methods for processing marijuana. (II-234:15-17.) Furthermore, a portion of Baxter's deposition was read at trial, which indicated that at the time of the removal Baxter could not recall having had any training on the risks associated with marijuana. (II-236:16-20.)

Following the passage of the Compassionate Use Act, HS 11362.5 (Prop 215) (1996), marijuana use has become more prevalent. In light of these societal developments, a reasonable jury could conclude that the likelihood of social workers encountering marijuana, medicinal or otherwise, in their investigations would increase. And as this likelihood increased, the jury could reasonably find that County's failure to provide social workers with the necessary training to ensure they were protecting individual rights was deliberately indifferent to a known or obvious risk. See Brown, 520 U.S. at 409. And in light of the inadequate training on marijuana, its medicinal use, and its methods for home processing, a reasonable jury could conclude that the County's failure to train was the moving force that caused Plaintiffs' injuries.

### B. Expert Testimony

Plaintiffs argue it was error for the Court to allow the testimony of the expert witnesses. (Doc. No. 215-1 at 22-23.) Defendants argue that Plaintiffs failed to properly raise their objections because they (1) did not file a Daubert motion and (2) did not raise this issue in a motion in limine. (Doc. No. 234 at 21.) In any event, Defendants argue that the information offered by the experts was helpful to the jury because it helped the jury assess the reasonableness of Defendants' actions. (Id. at 22-23.)

Evidentiary rulings on the admissibility of expert witness testimony are reviewed for abuse of discretion. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 141 (1997). "A new trial is only warranted on the basis of an incorrect evidentiary ruling if the ruling substantially prejudiced a party." <u>United States v. 99.66 Acres of Land</u>, 970 F.2d 651, 658 (9th Cir. 1992). This requires a showing that "more probably than not, the [Court's] error tainted the verdict." <u>Harper v. City of Los Angeles</u>, 533 F.3d 1010, 1030 (9th Cir. 2008). Rule 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. Expert testimony is admissible if the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." <u>Id.</u> The Ninth Circuit has interpreted Rule 702 to require that "[e]xpert testimony must be both relevant and reliable." <u>United States v. Vallejo</u>, 237 F.3d 1008, 1019 (9th Cir. 2001). The Court plays a "gatekeeping role" in ruling on the admissibility of expert testimony. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993).

On April 5, 2016, the Court issued a scheduling order. (Doc. No. 58.) This order set October 28, 2016 as the cutoff date for the parties to file any pretrial motions addressing <u>Daubert</u> issues. (<u>Id.</u>) Neither party filed a <u>Daubert</u> motion. (<u>See</u> II-274:9.) On February 17, 2017, Plaintiffs filed their motions in limine. (Doc. Nos. 140-144.) None of those motions challenged the admissibility of expert testimony on the grounds now raised.[5] On March 10, 2017, the Court issued the Pretrial Order. (Doc. No. 177.) At that time, both parties intended to present expert testimony and neither party raised any objections. (<u>Id.</u>) In accordance with the plan, Defendants told the jury in their opening to expect to hear from expert witnesses who would help explain the contents of Plaintiffs' home. (I-120:10-24.) Only after the first day of trial, after Defendants had told the jury to expect to hear from experts, did Plaintiffs' counsel raise, for the first time, their objection to Defendants' experts. (I-292:3-7.) At that time, the Court noted the past

---

[5] Plaintiffs moved to exclude any testimony, both expert and lay, containing opinion testimony on the existence of exigent circumstances on distinct grounds from those now raised. (Doc. No. 140.)

<u>Daubert</u> cutoff deadline, as well as the opportunity to raise the issue in motions in limine. (I-292:8-9, 292:8-14.) This objection was not timely. 21 Fed. Prac. & Proc. Evid. § 5037.1 (2d ed.) ("An objection must be made as soon as the ground of it is known, or could have reasonably have been known to the objector."). Plaintiffs offer no explanation for their delay in bringing their objection.

In any event, the expert testimony in this case was properly admitted. Fed. R. Evid. 702. Plaintiffs do not argue that the testimony was unreliable under <u>Daubert</u>, only that it was not helpful to the jury. (Doc. No. 215 at 22-23.) At trial, both Plaintiffs and Defendants offered testimony regarding marijuana, methods for extracting THC from marijuana, types of equipment used in extracting THC, and the risk or lack of risk posed by marijuana and marijuana processing methods. The experts' testimony explaining medicinal uses of marijuana, the risks and side effects of marijuana, the various forms of marijuana and marijuana-derivative products, and the different marijuana extraction processes was helpful to the jurors in understanding the case and met the standards under the law for expert testimony. (<u>E.g.</u>, III-15: 8-17, III-153:20-22, III-158:16-21, IV-62:8-63:4, 65:14-66:11.)

Plaintiffs belatedly argue that the expert testimony was unduly prejudicial under Rule 403. (Doc. No. 215-1 at 22.) Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A district court has "wide discretion" in weighing admissibility under Rule 403. <u>U.S. v. Layton</u>, 767 F.2d 549, 554 (9th Cir. 1985). Exercising its discretion, the Court concludes the probative value of the experts' testimony was not substantially outweighed by the concerns of Rule 403.

///

///

///

### C. Jury Instructions

#### 1. PARTICIPATION INSTRUCTION

Plaintiffs argue they should be entitled to a new trial because the Court declined to include their proposed "integral participation" instruction. (Doc. No. 215-1 at 24.) Defendants oppose this basis for a new trial, arguing that the instruction was unnecessary and, in any event, any error was harmless in light of the jury's verdict in favor of Baxter. (Doc. No. 234.)

"A court may grant a motion for a new trial where the jury instructions were erroneous or inadequate." <u>Boston Scientific Corp. v. Johnson & Johnson</u>, 550 F.Supp.2d 1102, 1110 (N.D. Cal. 2008). "Any error in instructing the jury in a civil case does not require reversal if it is harmless." <u>Acosta v. City of Costa Mesa</u>, 718 F.3d 800,827 (9th Cir. 2013).

The Court's instructions were not erroneous or inadequate. (Doc. No. 200.) As a starting point, the Court notes that this instruction is not included in the Ninth Circuit's Model Civil Jury Instructions—which contain a detailed section of § 1983 instructions. <u>See</u> Manual of Model Civil Jury Instructions (2007 ed.). Furthermore, Plaintiffs citation to <u>Boyd v. Benton County</u>, 374 F.3d 773, is factually distinct. There, the Ninth Circuit determined the "integral participant" rule was applicable because the "case clearly support[ed] a finding that each officer involved in the search was an 'integral participant.'" 374 F.3d at 780.

Here, in contrast, the evidence does not establish that Quinteros was an integral participant. Jemison testified that she assigned Baxter to do the investigation and that Quinteros went along for on the job training. (II-112:12-17.) Jemison was not Quinteros' supervisor and knew little about her background or training. (II-112:20-113:1.) When Baxter called Jemison to discuss the removal of the children, Quinteros did not participate in the conversation. (II-189:24-190:3.) In fact, Quinteros testified that she did not remember having any input in the decision about whether to remove C.L. and B.L. (II-190:23-24.) This is different from the situation in <u>Boyd</u>, where the court found

that every officer was "aware of the decision . . . , did not object to it, and [knowingly] participated." <u>Boyd</u>, 374 F.3d at 780.

Furthermore, Plaintiffs' proposed "integral participation" instruction was confusing and misstated the law in <u>Boyd</u>. <u>See</u> <u>Bettcher Indus., Inc. v. Bunzl USA, Inc.</u>, 661 F.3d 629, 639 (Fed. Cir. 2011) ("a party seeking to alter a judgment based on erroneous jury instructions must establish . . . it requested alternative instructions that would have remedied the error"). Plaintiffs' proposed instruction was confusing as it used multiple linguistically similar phrases ("personal participation," "'participation,'" "'personally participated,'" and "'integral participation,'") without clarifying their logical relationship.[6] Additionally, the proposed instruction misstated the law in <u>Boyd</u>. In order to find § 1983 liability, <u>Boyd</u> requires awareness, a failure to object, and participation. 374 F.3d at 780. But Plaintiffs' instruction suggests that only knowledge plus a failure to object is sufficient. (Doc. No. 170 at 54.)

In any event, Plaintiffs' are also not entitled to a new trial because there was no prejudice to them. By Plaintiffs' own admissions, this instruction was intended for Quinteros, who had a minor role in the removal because of her on-the-job training status. (Doc. No. 215 at 25.) However, the jury found that Ian Baxter, who was primarily responsible for the on-site investigation, had not acted unreasonably. As such, there is no reason to think that had Plaintiffs' instruction been offered, it would have changed the outcome as to Quinteros.

## 2. PROCEDURAL DUE PROCESS INSTRUCTION

Plaintiffs argue that a new trial is warranted because the Court did not give a procedural due process instruction, instead giving the Model Jury Instructions and other instructions. (Doc. No. 215-1 at 25.) Defendants argue that the Court properly omitted the procedural due process instructions because there was no procedural due process

---

[6] For example, to establish a § 1983 claim, there must be "personal participation." However, there can be "participation" without someone "personally participating." And the instruction never clarifies how this all relates to "integral participation."

claim alleged in this case, Plaintiffs could not assert a claim of procedural due process, Plaintiffs never actually submitted procedural due process instructions, Defendants are entitled to qualified immunity as to the procedural due process claims, and Plaintiffs cannot prove any failure to give the instructions was prejudicial. (Doc. No. 234 at 25-26.) The Court agrees with Defendants.

Plaintiffs have not pointed to any mention of procedural due process in the operative pleadings or pretrial order. (Doc. No. 215-1 at 25.) The operative amended complaint does not mention procedural due process. (Doc. No. 17.) Furthermore, the Pretrial Order, prepared by the parties, does not mention procedural due process. (Doc. No. 177.) And once issued, the Pretrial Order "controls the course of the action." Fed. R. Civ. P. 16(d). "The court may modify the order issued after a final pretrial conference only to prevent manifest injustice." Fed. R. Civ. P. 16(e).

In any event, Plaintiffs offer no legal support for the proposition the instructions should have been different if they were pursuing a procedural due process claim. The appropriate Fourteenth Amendment standards are set forth clearly in the Ninth Circuit precedent, such as Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000), and Rogers v. Cnty. of San Joaquin, 487 F.3d 1288 (9th 2007). And the jury instructions used in this case employ those standards. Indeed, the Court included much of the substance of Plaintiffs' proposed instructions in the final instructions. (Compare Doc. No. 170 at 50 with Doc. No. 200, Jury Instruction No. 19.) Plaintiffs offer no legal support for their conclusion that there is a separate set of elements that should be used in a procedural, versus a substantive, due process claim. As such, any error is harmless and Plaintiffs have shown no prejudice.

///
///
///
///
///

3:13-cv-02818-H-JMA

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motion for a new trial. (Doc. No. 215.) The Court denies Defendants' motion for judgment as a matter of law, (Doc. Nos. 219, 229), and their motion to set aside the judgment against the County, (Doc. Nos. 218, 230). Defendant Benita Jemison violated C.L. and B.L.'s Fourth Amendment Rights but is entitled to qualified immunity. The County was deliberately indifferent in failing to adequately train its social workers and liable in the amount of $1 in nominal damages to C.L. and B.L, but not liable as to the parents. Since the Court affirms judgment against the County, Plaintiffs C.L. and B.L. may seek attorneys' fees and costs as the prevailing parties. In light of the post-trial rulings, the Court will issue an amended judgment and set a briefing schedule for attorneys' fees and costs.

**IT IS SO ORDERED.**

DATED: August 18, 2017

Hon. Marilyn L. Huff
United States District Judge

3:13-cv-02818-H-JMA